```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- x
UNITED STATES OF AMERICA               :
                                       :
            -v-                        :    07 Cr. 609 (JSR)
                                       :
MENTOR DAIJA,                          :    MEMORANDUM ORDER
                                       :
            Defendant.                 :
--------------------------------------- x
```

JED S. RAKOFF, U.S.D.J.

Upon consideration of the evidence submitted at the "Fatico" hearing held before the Court on December 13 and 14, 2007 and the pre- and post-hearing letter briefs submitted by the parties, the Court finds that 1) the Guidelines' murder cross-reference applies to Counts One, Two, and Five and 2) a ten-year mandatory sentence under 18 U.S.C. § 924(c)(1)(A)(iii) must be imposed on Count Three. The findings of fact and conclusions of law supporting these rulings are set forth below.

To the extent that there are material questions of fact between the Government and the defendant relevant to the issues here in dispute, the Court finds that the Government's witnesses were entirely credible and that Mr. Daija was not credible: there were just too many inconsistencies and convenient shifts in his account over time for the Court to accept as true his latest, exculpatory and rather far-fetched version.

Specifically, the Court finds as follows: Daija, as he admitted in his plea as well as in his testimony, became involved in a conspiracy to distribute marijuana while living in the apartment of a man named Altin Simoni. Simoni, also a conspirator, kept a gun in

the apartment as part of the conspiracy.  On May 4, 2007, Daija was attacked just outside the third floor apartment by two men who were there to rob the conspirators of drugs and drug proceeds.  During the altercation, the two men forced their way into the apartment and one of the men, Timur Alkhazov, pulled a gun.  Daija resisted, and managed to get the gun away from Alkhazov, whereupon he shot Alkhazov in the head at least once, and possibly shot him several more times in the body.  The second, unknown, man managed then to wrest the gun back from Daija and, according to Daija, attempted to shoot Daija with it.  When the gun did not fire, the robbers fled.

Although many details of the immediately subsequent events are disputed, it is at least clear that, over the next few minutes, Daija retrieved Simoni's gun from Simoni's bedroom, left the apartment, and shot several more times at Alkhazov, who, already wounded, was then positioned on the stairway landing between the second and third floors.  At least one of these subsequent shots hit Alkhazov in the head.  Alkhazov died as a result of the gunshots inflicted by Daija.

Daija also removed from the apartment a bag containing approximately $50,000 in cash and left it on the roof, after which he departed down a fire escape.  He was later apprehended by the police in a nearby cemetery.

Section 2D1.1(d)(1) of the U.S. Sentencing Guidelines, applicable to Counts One and Two, provides that "[i]f a victim was killed under circumstances that would constitute murder under 18

U.S.C. § 1111" the Guidelines calculations for first or second degree murder should be applied, as appropriate. U.S. Sentencing Guidelines Manual § 2D1.1(d)(1) (2007). Section 2K2.1(c)(1) of the Guidelines provides a similar cross-reference for Count Five. Id. § 2K2.1(c)(1).

Under 18 U.S.C. § 1111, murder is defined as "the unlawful killing of a human being with malice aforethought." The term "malice aforethought" is not defined in § 1111, but "where a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." United States v. Turley, 352 U.S. 407, 411 (1957). Under the common law, malice aforethought is "the characteristic mark of all murder.... It may be discoverable in a specific deliberate intent to kill. It is not synonymous with premeditation, however, but may also be inferred from circumstances which show a wanton and depraved spirit, a mind bent on evil mischief without regard to its consequences." Virgin Islands v. Lake, 362 F.2d 770, 774 (3d Cir. 1966); see also Oliver Wendell Holmes, Jr., The Common Law 51-60 (Little, Brown & Co. 1944). Self defense is a justification to homicide "if a man reasonably believes that he is in immediate danger of death or grievous bodily harm from his assailant." Brown v. United States, 256 U.S. 335, 343 (1921).

The Court credits the testimony of Dr. James Gill, Chief Medical Examiner for Bronx County, that both of the head wounds Alkhazov suffered were potentially fatal wounds. See Fatico

3

transcript at 13:6-8, 22:12-25. But it is also clear that the first head wound did not initially kill Alkhazov, who was able to escape to the landing. The Court also finds, based on Dr. Gill's testimony, that it was there, some minutes after the initial shooting, that Daija administered the coup de grace to Alkhazov by shooting him again in the head. Id. at 23:11 to 24:2.

When Daija inflicted this fatal wound, the Court finds that he was acting with the requisite malice aforethought. Uncertain of Alkhazov's status, Daija's plain intent was to finish the job by making certain he was dead. It may be noted, moreover, that even assuming arguendo that this was not his express intent, he certainly acted so recklessly as to show "a mind bent on evil mischief without regard to its consequences."

The real question, then, is whether this second head shot was fired in self-defense. The Court finds that it was not. The defendant could not have "reasonably believe[d] that he [was] in immediate danger of death or grievous bodily harm from his assailant" under the circumstances here. Daija had already shot Alkhazov in the head, a wound which Dr. Gill testified caused a large amount of bleeding. See Fatico transcript at 13:9-22. Further, Daija knew that Alkhazov had been disarmed and, even if Alkhazov had regained possession of his gun, that the gun was either malfunctioning or out of bullets. See id. at 73:9 to 74:9, 76:6-10. Alkhazov, wounded and disarmed, had withdrawn from the altercation in the apartment by leaving the scene, id. at 76:1-7, but Daija, rather than remaining in the apartment or immediately exiting via the fire escape, instead

4

retrieved Simoni's gun and followed his attackers out the door. See id. at 76:23-25. Given all these circumstances, as well as the Court's doubts about Daija's credibility and the adverse inferences that the Court draws from Daija's lack of credibility, the Court finds that Daija did not actually believe that he was in "immediate danger of death or grievous bodily harm" from Alkhazov when he administered the final, fatal shots. The second-degree murder cross-references in the Guidelines are thus applicable to the Guidelines calculations for Counts One, Two, and Five.

Turning to Count Three, Daija pleaded guilty to a violation of 18 U.S.C. § 924(c)(1)(A), which provides in relevant part:

> [A]ny person who, during and in relation to any ... drug trafficking crime ... for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such ... drug trafficking crime --
> 
> (i) be sentenced to a term of imprisonment of not less than 5 years; ...
> 
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

Subsection (iii) is a sentencing factor to be determined by the Court. Harris v. United States, 536 U.S. 545, 556 (2002). In order for subsection (iii) to apply, the Government must show that 1) the defendant possessed a firearm in furtherance of the relevant drug trafficking crime, 2) the defendant continued to possess it in

5

furtherance of the crime when it was discharged, and 3) the defendant discharged the firearm intentionally, that is, not accidentally.[1]

Daija admitted to the first and third elements in his plea allocution. The second element is met here as well. A gun is possessed in furtherance of a relevant drug crime when there is "a showing of some nexus between the firearm and the drug selling operation," United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001), that is, the "possession of the firearm facilitated a drug trafficking crime." United States v. Lewter, 402 F.3d 319, 322 (2d Cir. 2005).

When the defendant left the apartment after the initial altercation with the two robbers, at least part of the reason that he took Simoni's gun with him, the Court finds, was for the purpose of helping to evade arrest for the underlying drug crime. See, e.g., United States v. Currier, 151 F.3d 39, 41 (1st Cir. 1998) (noting that "grabbing a gun in hopes of postponing or escaping an imminent arrest for an underlying drug trafficking crime violates § 924(c)(1)"); United States v. Tolliver, 116 F.3d 120, 126 (5th Cir. 1997) (holding that use of a gun to "prevent[] the arrest of two conspirators and forestall[] the seizure of various instrumentalities of the conspiracy" may "facilitate" the conspiracy). The Court does

---

[1] Although the Second Circuit has not addressed the issue of the intent required for the discharge element, two circuits have found that no specific intent is required, i.e., no intent to further the drug crimes, but that there must be an intent to discharge. See United States v. Brown, 449 F.3d 154, 156-59 (D.C. Cir. 2006); United States v. Dare, 425 F.3d 634, (9th Cir. 2005). The Court finds the reasoning of these cases persuasive.

6

not credit Daija's testimony that he was not afraid of, and did not seek to escape, arrest.  See, e.g., Fatico transcript at 98:13-19.  Daija's actions both before and after the shooting on the landing -- leaving the apartment rather than waiting for the police to arrive, throwing Simoni's gun out a window, fleeing the apartment building through the fire escape, and hiding in a cemetery rather than approaching or calling the police -- are consistent with someone trying to evade the police, not with someone who was indifferent to the prospect of arrest.  Daija well knew that, once the police started investigating the circumstances, they would recognize his conduct in an underlying drug conspiracy and that, therefore, whether or not they credited his account of self-defense, they would arrest him for the underlying drug offenses.  He therefore took the gun with him for potential use in evading arrest, and thus in furtherance of the drug conspiracy.

Daija's possession of the gun also facilitated the drug conspiracy because it facilitated his removal and concealment of drug proceeds from the apartment.  The Court does not credit Daija's testimony that he removed the money from the apartment only after he had shot Alkhazov on the landing, and that his motive for doing so was to pay a neighbor to let him into another apartment.  See, e.g., Fatico transcript at 78:11-23.  Indeed, Daija's narrative of his actions in this regard -- leaving the apartment with Simoni's gun, shooting Alkhazov on the landing, walking up to the fourth floor to drop the gun out of a window, returning to the third floor apartment to exit via the fire escape, instead retrieving approximate $50,000

and going to the sixth floor to seek refuge in another apartment, knocking on the door of only one apartment on the sixth floor before hiding the money on the roof, and then ultimately returning to the third floor apartment to exit via the fire escape -- is wholly incredible. The Court finds instead that Daija left the apartment with both the money and the gun in order to conceal the money and avoid detection, shot Alkhazov on the landing, dropped the gun out of a window on his way up to the roof (where he left the money), and then returned to the apartment to exit the building. Thus, at the time he shot Alkhazov on the landing, Daija possessed the gun in furtherance of the drug conspiracy because he was using it to protect himself while he concealed the proceeds of the conspiracy.

Defense counsel submits that, even if all the required elements are met, the subsection (iii) sentencing enhancement should not apply if the discharge of the gun was in self-defense. As discussed above, the Court finds that Daija did not shoot Alkhazov on the landing in self-defense. However, even if that were not the case, a claim of self-defense is irrelevant to a § 924(c) charge as long as the required elements are met. See, e.g., United States v. Sloley, 19 F.3d 149, 153 (4th Cir. 1994); United States v. Johnson, 977 F.2d 1360, 1378 (10th Cir. 1992); United States v. Poindexter, 942 F.2d 354, 360-61 (6th Cir. 1991).

Accordingly, the Court finds that 1) the Guidelines' second-degree murder cross-reference applies to Counts One, Two, and Five and 2) a ten-year mandatory sentence under 18 U.S.C. § 924(c)(1)(A)(iii) must be imposed on Count Three. Daija's

8

sentencing, firmly scheduled for February 20, 2008, at 2:30 p.m., will proceed on this basis.

    SO ORDERED.

                                            JED S. RAKOFF, U.S.D.J.

Dated: New York, New York
       January 10, 2008